IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case no.:  1:22-cv-00194

KCOOPER BRANDS, INC. D/B/A
DEMPSEY INTERNATIONAL PACKAGING,

      Plaintiff,

  v.

EZZIGROUP INC., and RAY RASOULI,

      Defendants.

## COMPLAINT

Plaintiff KCooper Brands, Inc. d/b/a/ Dempsey International Packaging ("Dempsey"), through undersigned counsel, brings the following Complaint against Defendants Ezzigroup Inc.("Ezzigroup") and Ray Rasouli, and alleges the following:

## INTRODUCTION

1. This is an action for fraud and breach of contract arising from fraudulent misrepresentations made by Ezzigroup and its CEO, Rasouli, to procure an agreement with Dempsey to deliver certain purchased products to Dempsey, and Ezzigroup's failure to comply with its contractual obligations and deliver the products as it promised to do.

2. Rasouli, on behalf of Ezzigroup, represented to Dempsey that Ezzigroup owned and operated a factory in China that could supply products for which Dempsey sought a supplier. Rasouli and Ezzigroup represented that Ezzigroup had a unique relationship with the Chinese government that would allow Ezzigroup to procure rebates for the product and to negotiate obstacles in shipping that would ensure delivery of the purchased product at the quoted price and

within the allotted time. Dempsey acted in reliance on those representations in entering into a contract with Ezzigroup and submitting purchase orders thereunder.

3. Ezzigroup's representations were false. It did not own or operate a factory in China; instead it attempted to fulfill Dempsey's purchase orders by outsourcing them to another entity. Its representations of having special relationships with the Chinese government that would allow it to navigate through the obstacles faced by the shipping industry have also proven false. Ezzigroup's representations that it could procure the purchased product at the promised price point were predicated on funds Ezzigroup expected would be generated by filing fraudulent rebate claims with the Chinese government

4. Though Dempsey has complied with its obligations under the parties' contracts, including making substantial payments in advance on the purchased product, Ezzigroup failed to ship the majority of the product Dempsey purchased, and also failed to pay the costs of shipping as required under the parties' contract. In the process, substantial funds Dempsey provided to Ezzigroup for the express purpose of paying for the purchased goods to be shipped have been misallocated.

5. Based on the misrepresentations made by Rasouli on behalf of Ezzigroup and Ezzigroup's failure to comply with its obligations under the parties' agreements, Dempsey seeks damages rising from Defendants' wrongful conduct, including but not limited to damages Dempsey has been required to incur to procure replacement products and costs Dempsey has been required to pay to arrange for delivery of products that should have been delivered to the designated destination, and interest, plus attorney's fees and costs as allowed under the parties' contract.

## PARTIES

6. Plaintiff KCooper Brands, Inc. d/b/a Dempsey International Packaging ("Dempsey") is a Colorado corporation located at 27371 E Lakeview Dr., Aurora, Colorado 80016.

7. Defendant Ezzigroup Inc. ("Ezzigroup") is a corporation registered in the province of Ontario, Canada with its principal offices in Ontario, Canada.

8. Defendant Ray Rasouli is a citizen and resident of Canada and the CEO of Ezzigroup.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Dempsey's claims occurred in Colorado.

11. This Court has specific personal jurisdiction over Defendants because this action rises out of their contacts with this forum—specifically, Ezzigroup's contract with Dempsey, a Colorado company located in Colorado, and representations sent to Dempsey in Colorado. In addition, the contract with Dempsey requires the application of Colorado law to adjudicate this dispute.

## FACTUAL ALLEGATIONS

12. Dempsey is a Colorado business which provides packaging supplies for other businesses. Among other things, Dempsey is engaged in the marketing and sale of products including sanitation wipes.

13. Ezzigroup represented to Dempsey that it is engaged in the supply and services of certain products, including the sanitation wipes for which Dempsey is engaged in the marketing and sale.

14. In or around July 2021, Ezzigroup, through Rasouli, represented to Dempsey that it wished to manufacture the wipes Dempsey was marketing.

15. Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a factory in China where the wipes would be manufactured.

16. Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a special relationship with the Chinese government that would allow it to secure a rebate for the manufactured product above and beyond the normal export rebate (approximately 13%).

17. Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup's relationship with the Chinese government allowed Ezzigroup to procure the government's cooperation in navigating through obstacles that were then plaguing the shipping industry, which would ensure that any product Dempsey purchased through Ezzigroup would arrive in a timely manner.

18. Ezzigroup, through Rasouli, represented to Dempsey that, if it proved to be necessary, Ezzigroup had the ability to move equipment to Canada to manufacture the wipes for Dempsey; that Ezzigroup had a preferred relationship with the Canadian government, including as a preferred supplier of PPE masks and gloves to the Canadian government; and that he delivered weekly shipments by air from China to Canada.

19. Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a facility in Tennessee where it could manufacture wipes for Dempsey.

20. Ezzigroup and Rasouli knew these representations were material to Dempsey, as Dempsey's ability to receive the purchased products at the purchased price and without unexpected delays provided Dempsey with assurances but for which Dempsey would have looked to other suppliers for the wipes.

21. Timing in particular was essential, because, as Ezzigroup and Rasouli knew, Dempsey would use the purchased product to fulfill its obligations to its customers and other purchasers of the wipes.

22. Ezzigroup was specifically aware that Dempsey required delivery of the product beginning on August 15, 2021, and represented to Dempsey that Ezzigroup would begin delivering the purchased product to Dempsey on August 15.

23. Relying on these representations, Dempsey submitted purchase orders to Ezzigroup on or around July 8, 2021, and again on or around July 14, 2021, through which Dempsey collectively purchased approximately 40,000 containers of wipes. The purchase orders designated as the destination for the purchased goods the address of a Dempsey customer in Tennessee.

24. Dempsey also entered into a Product Supply Agreement with Ezzigroup on or around July 23, 2021.

25. The terms of the Product Supply Agreement called for Ezzigroup to ship the purchased wipes CIF—a term used in international shipping meaning "cost, insurance, and freight," requiring the shipper to assume all costs of shipping to a designated delivery point.

26. Under the Product Supply Agreement, Dempsey was to purchase wipes from Ezzigroup "in such amounts and at such prices as agreed by the Parties."

27. Under the Agreement, Ezzigroup agreed to "fill the projected demand, source, and procure product to have available for Dempsey, which shall be determined by a rolling forecast and at Dempsey's direction."

28. As specified in an attachment to the Agreement, the product was to be delivered at a rate of approximately 10,000 cases per week, 40,000 cases per month, and 480,000 cases per year, with each case to contain ten units of product. Delivery of the product was to begin on August 15, 2021. Contemporaneous communications exchanged before and after execution of the Agreement confirm the contractual expectation of delivery beginning on August 15, 2021.

29. The terms of the Product Supply Agreement state that Dempsey would submit subsequent purchase orders, pursuant to which Ezzigroup was to deliver the products at a location designated by Dempsey, "within the specific lead-time of receipt of a purchase order"—specified as "90 days out."

30. The terms of the Product Supply Agreement acknowledge that Ezzigroup "assumes responsibility for the Products, and all risk of damage, loss, until the Products are delivered at the Delivery Point." This made Ezzigroup responsible for paying all costs of shipping, transport, and delivery of the purchased product to the destination designated by Dempsey.

31. The agreement required Dempsey to provide fifty percent of the purchase price for the wipes upon placing the purchase order, an additional thirty percent of the purchase price upon receiving notification that the purchased goods had shipped, and the remaining twenty percent of the purchase price upon receipt of the purchased goods.

32. The Product Supply Agreement specifically stated that the price of each product would include "material costs, packaging costs, tooling cost, warehousing costs, freight and

logistics costs, all applicable taxes, customs duties, export duties, or similar tariffs or fees that Supplier may be required to pay or collect in connection with the performance of its obligations under, or in furtherance of, this Agreement." This makes clear that the purchase price, including those portions to be paid in advance of receipt, were to provide Ezzigroup with the funds it needed to pay all costs of shipping and freight to the designated destination at the designated time.

33. Other than paying the required percentages purchase price at the various stages of the shipping process, Dempsey's sole responsibility in connection with the purchased product was to receive it at the designated destination point within the specified time.

34. The Product Supply Agreement further provided that the agreement could be terminated for a material breach of the agreement by the other party, if that breach was not cured within thirty days of receipt of written notice thereof—though such termination would not affect or terminate rights and obligations that had accrued thereunder prior to such default in delivery or payment.

35. The Product Supply Agreement also provides that Ezzigroup would indemnify, defend, and hold harmless Dempsey against all claims, actions, damages, losses, liabilities, and expenses, including reasonable outside attorney's fees, rising out of or caused by any breach of any of the representations, undertakings, or agreements made by Ezzigroup.

36. Pursuant to the Product Supply Agreement, Dempsey submitted a purchase order to Ezzigroup on August 5, 2021 for the purchase of 40,000 cases, in addition to the ones submitted in July 2021. This purchase order likewise designated as the destination for the purchased goods the address of a Dempsey customer in Tennessee.

37. In total, by August 15, 2021—when, under the terms of the Agreement, the product was to begin being delivered—Dempsey had submitted purchase orders for 80,000 cases, or 800,000 boxes, of product.

38. In accordance with its obligations under the Product Supply Agreement, Dempsey paid fifty percent of the purchase price on the purchased goods in connection with submitting the purchase orders.

39. As of September 3, 2021, Ezzigroup's reports to Dempsey showed that Ezzigroup was projected to deliver less than 2,000 cases, or 20,000 units of product, by the end of September 2021, even though the factory had produced over 500,000 units of product. Thus, Ezzigroup's reports were showing that the finished product was not being shipped.

40. On September 3, 2021, Dempsey sent Ezzigroup and Rasouli written notice of Ezzigroup's material breach of the contract. In the notice, Dempsey reminded Ezzigroup that Dempsey had ordered 800,000 units of product, and that the Agreement called for delivery of 400,000 units (i.e., 40,000 cases) per month starting August 15th, 2021, and that the Agreement had been given under the pretense that Ezzigroup had a special arrangement that would allow it to make deliveries to the USA on time regardless of the current escalating freight costs and constraints. Dempsey therefore demanded that the situation be immediately corrected, as it had and continued to put Dempsey in great jeopardy and liability with its customer.

41. In total, Dempsey has purchased, and paid the fifty-percent deposit on, a quantity of product corresponding to ninety-six shipping containers.

42. To date, of the ninety-six containers Dempsey purchased, Ezzigroup shipped only forty-five.

43. Furthermore, as of November 2021, there has been only one container that Ezzigroup paid all charges necessary for delivery to the designated destination in Tennessee.

44. Ezzigroup had shipped a fraction of the purchased goods piecemeal via air shipments to Chicago. This, however, this represented only a small portion of the total goods Dempsey purchased—an amount corresponding to approximately nine containers, out of the ninety-six Dempsey purchased. Even for this small portion, Dempsey was required to pay for those air-shipped goods to be picked up from port, repalletized, and consolidated on pallets before transport to Tennessee.

45. In addition, what few portions of the product were shipped (rather than sent by air) were sent to the port in Los Angeles, with no arrangements made for their delivery to the designated destination in Tennessee. Dempsey has had to arrange and pay for shipment to their ultimate destination—costs which, under the Product Supply Agreement, were to be paid by Ezzigroup.

46. In connection with each of the forty-five containers for which Ezzigroup gave Dempsey notice that the container had shipped, Dempsey paid the additional thirty percent of the purchase price.

47. Ezzigroup also failed to pay for the shipping and freight costs to ship what portion of the purchased goods were shipped.

48. As of the date of the filing of this complaint, several containers are being held in storage, with the shippers refusing to release the goods to Dempsey until the outstanding shipping, freight, and other charges are paid. Those charges include demurrage and storage fees that mount day by day as Ezzigroup continually fails to pay them.

49. Because of Ezzigroup's failure to provide the product Dempsey purchased, Dempsey was required to look to other sources and purchase replacement products at a price well in excess of what it contracted with Ezzigroup in order to preserve its relationships with its customers.

50. The amounts Dempsey expended to procure this replacement product and preserve its relationships exceed $2 million.

51. Dempsey has taken still other measures to limit the damages it has suffered due to Ezzigroup's breaches. For example, the shippers have notified Dempsey's customers that they intend to abandon the cargo if the outstanding freight charges are not paid, effectively wasting the amounts Dempsey spent to purchase the product. Dempsey has instructed those carriers to continue to hold the cargo pending resolution of the outstanding balances. As long as Ezzigroup fails to pay the charges, however, the risk remains that the carriers will abandon the product and the value of the purchased product will be lost.

52. Of the containers that shipped, only 11.5 were received by Dempsey.

53. Dempsey paid the remaining twenty percent of the purchase price on 8.4 of these containers, withholding payment on the remaining 3.1 in light of the substantial payments Dempsey had already made on containers that never shipped, and containers that shipped but for which Ezzigroup never paid the shipping costs.

54. The total amount Dempsey has paid Ezzigroup for the wipes is over $1.7 million—representing fifty percent of the purchase price for all 96 containers, an additional thirty percent for 45 containers, and the remaining twenty percent for 8.4 containers.

55. After executing the contract and submitting the purchase orders, Dempsey learned that Ezzigroup did not manufacture or intend to manufacture the wipes at all, as it represented, and did not own or operate the factory where the wipes would be manufactured.

56. Instead, Ezzigroup outsourced the requirement to supply the wipes to a Chinese organization named Octopus Supply Chain Management Company.

57. Octopus likewise did not own or operate the factory; instead, it purchased the wipes from a factory Dempsey understands is wholly owned by the Chinese government.

58. Dempsey has learned that Octopus purchased the product from the government-owned factory for $1.60 per case, but filed a tax rebate claim asserting that it had purchased the wipes at a price of $5.50 per case—a clear instance of tax fraud.

59. On information and belief, Dempsey asserts that Ezzigroup was aware that Octopus, a close business partner with Ezzigroup, filed or intended to file claims for tax rebates that made fraudulent claims as to the purchase price. This belief is based in part on information including Ezzigroup's representations that it could get substantial rebates beyond the normal export rate.

60. On information and belief, Dempsey asserts that this potential for unlawful gains was part of Ezzigroup's motivation for agreeing to provide the wipes to Dempsey at the offered price. That is, Ezzigroup's knowledge of this source for illicit revenue was a substantial motivation for its willingness to participate in the transaction with Octopus and Dempsey.

61. Ezzigroup's representations that it owned and operated the means of production and that it had special relationships with the Chinese government that would allow it to supply the purchased products within the allotted time were false.

11

62. Ezzigroup knew they were false.

63. Ezzigroup made those representations for the purpose of inducing Dempsey to transact with Ezzigroup to allow Octopus to engage in the fraudulent scheme.

64. Documents and other correspondence show that Dempsey has paid Ezzigroup $250,000 more than what Ezzigroup paid for the product it purchased to supply to Dempsey. In other words, the net result of Ezzigroup's interactions with Dempsey is that it has been enriched by a net amount of at least $250,000.

65. Under the Product Supply Agreement, Ezzigroup should have allocated that amount toward the cost of shipping the purchased product—most urgently, the goods it has shipped already, and which remain in storage until those costs are paid.

66. Instead, Ezzigroup has retained that $250,000 as profit without either supplying the purchased goods or paying for shipping and transportation as required.

67. Ezzigroup has asserted to Dempsey that it has not paid the outstanding shipping costs, or supplied the outstanding purchased goods, because Dempsey has not continued to issue purchase orders and supply the initial fifty-percent deposit on those goods. Were Dempsey to do so, Ezzigroup asserted, it could use that fifty-percent deposit to pay the outstanding shipping costs on goods already shipped and continue to procure and ship the remaining purchased goods.

68. Ezzigroup thus acknowledges that its arrangement with Dempsey is effectively a pyramid scheme: new payments, made in connection with new purchase orders (which thus impose new obligations on Ezzigroup), are purportedly required to satisfy *old* obligations in connection with *old* purchase orders.

69. Ezzigroup has also asserted to Dempsey that Dempsey's failure to continue to issue purchase orders notwithstanding Ezzigroup's failure to complete the initial ones excuses Ezzigroup's failure to perform, because the commitment to ongoing purchases is necessary to justify initial upfront investments in infrastructure to be able to provide the requested supply of product. This assertion, too, is transparently baseless, given that Ezzigroup has not produced any of the purchase product, and has instead outsourced it to another company that has supplied the product as manufactured by a Chinese Government-owned manufacturing facility.

70. Ezzigroup, through Rasouli, asserted that the factory made capacity investments to service the contract with Dempsey. However, the factory did not expand; rather, it outsourced the production to another factory.

71. In addition to the fact that every excuse Ezzigroup has offered is facially deficient, the fact remains that Dempsey timely complied with all of its obligations under the Product Supply Agreement, including its obligation to purchase the wipes and pay the required deposits upon submitting the purchase order and receiving notification of shipment, prior to issuing written notice to Ezzigroup of its breach.

72. On the other hand, Ezzigroup failed from the outset to comply with its obligations under the Product Supply Agreement, including to arrange for the product's delivery to the designated destination in Tennessee and pay for all costs of shipping and freight associated therewith.

73. Ezzigroup, through Rasouli, represented to Dempsey that Octopus had secured shipper financing for the remaining shipments based on a commitment of ongoing business. On information and belief, Dempsey alleges that Octopus secured that purported commitment through

false pretenses, by sending falsified documents to the shippers in order to gain financing and get shipments released.

74. Supporting that belief, Rasouli approached Dempsey on a number of occasions asking Dempsey to give Ezzigroup fake purchase orders from a company affiliated with Dempsey for the purpose of causing the shipper to believe that there was more business coming from Ezzigroup, and thereby inducing the shipper to enter into agreements to ship and/or release the product intended for Dempsey. Though Dempsey refused to comply with this request, Dempsey believes Ezzigroup made similar requests to other companies that complied with those requests.

75. Based on these facts and continued misrepresentations, on information and belief, Dempsey alleges that Ezzigroup never intended to comply with its contractual duties to Dempsey, and entered into the Product Supply Agreement with the intention of requiring Dempsey to comply with its obligations to provide the up-front portions of the purchase price without complying with Ezzigroup's obligations to supply the purchased product in the amounts and time required by the Agreement.

76. Ezzigroup's material breaches of its obligations under the Product Supply Agreement excuse Dempsey's obligations, including its obligation to continue sending purchase orders to a supplier that has been unable or unwilling to comply with its obligations notwithstanding that it has received substantial payment that was to be used to satisfy those very obligations.

77. Dempsey formally terminated the Product Supply Agreement on January 6, 2022.

## COUNT 1

### Fraudulent Misrepresentation (All Defendants)

78. Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.

79. Rasouli and Ezzigroup made specific representations of fact, including that Ezzigroup owned and operated manufacturing facilities in China and had a special relationship with the Chinese government that would allow them to navigate obstacles in shipping the products Dempsey would purchase from Ezzigroup and ensure that Ezzigroup could supply the purchased product at the quoted price and within the requested time.

80. Rasouli and Ezzigroup knew those representations were false.

81. Rasouli and Ezzigroup made those representations with the intention of inducing Dempsey to rely on those representations and purchase the wipes from Ezzigroup instead of looking for other sources to supply the wipes.

82. Dempsey reasonably acted in reliance on those representations and entered into the Product Supply Agreement with Ezzigroup.

83. Dempsey's reliance on Ezzigroup has already caused it to suffer significant damages, including in particular the purchase price it has paid on product that Ezzigroup never shipped, as well as product that Ezzigroup shipped but never arranged or paid for delivery to the designated destination.

84. Dempsey's reliance on Ezzigroup also caused it to suffer damages for the amounts Dempsey had to spend to procure alternative sources of product and preserve customer relationships.

85. Dempsey is entitled to recover these and all other damages Dempsey may suffer as a direct result of the fraudulent misrepresentations made by Rasouli and Ezzigroup.

## COUNT 2

### Fraud by Omission (All Defendants)

86. Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.

87. Rasouli and Ezzigroup failed to disclose to Dempsey material facts that they had a duty to disclose to Dempsey in order to render not misleading the representations they made concerning Ezzigroup and its operations in China, including those outlined in connection with Count I above.

88. In addition, Rasouli and Ezzigroup failed to disclose material facts including that Octopus was involved in acts of fraud against the Chinese Government, including by submitting requests for tax rebates that claimed Octopus purchased the product at prices several times higher than what it actually paid.

89. Had Dempsey been aware of Octopus's conduct, it would have refused to enter into the Product Supply Agreement, and would have looked to other sources for the purchased product such that Dempsey would not be even indirectly involved in such illegal schemes.

90. Rasouli and Ezzigroup were aware of Octopus's fraudulent conduct but deliberately failed to disclose that information to Dempsey with the intent of securing Dempsey's execution of the Product Supply Agreement.

91. Dempsey executed the Product Supply Agreement under the false impression that Rasouli and Ezzigroup had disclosed all material facts they had a duty to disclose.

92. Dempsey has suffered and is entitled to recover all its damages outlined above.

## COUNT 3

### Breach of Contract (Ezzigroup)

93. Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.

94. Dempsey and Ezzigroup entered a binding contract that required Ezzigroup to deliver the purchased goods at a designated destination.

95. Ezzigroup breached the contract by failing to deliver the purchased goods at the designated destination by the specified due date.

96. Ezzigroup further breached the contract by failing to pay the costs of shipping and freight for the purchased goods.

97. Ezzigroup further breached the contract by failing to manufacture or procure and ship the goods Dempsey purchased.

98. Dempsey complied with all its obligations under the Product Supply Agreement or is excused from performance thereunder due to Ezzigroup's material breaches.

99. Dempsey has satisfied any and all conditions precedent to bring this lawsuit.

100. Dempsey suffered damages as a result of Ezzigroup's breach, including but not limited to the purchase price it paid on goods that were never delivered, amounts Dempsey has had to pay to secure alternative sources of product, shipping and freight costs Dempsey has had to pay, and attorney's fees and costs (to which it is entitled under the contract).

## COUNT 4

### Promissory Estoppel (Ezzigroup)

101. Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.

102. Ezzigroup made a promise to Dempsey that it would provide the product that Dempsey ordered.

103. Ezzigroup should reasonably have expected that its promise would induce action by Dempsey.

104. Dempsey reasonably relied on the promise to its own detriment, including in particular by paying a substantial portion of the purchase price.

105. Ezzigroup's promise must be enforced to prevent injustice.

## COUNT 5

### Unjust Enrichment (Ezzigroup)

106. Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.

107. Dempsey asserts this unjust enrichment claim in the alternative to its contract-based claims.

108. Dempsey conferred a benefit upon Ezzigroup in the form of the payments made as a deposit toward the purchase price of the wipes Dempsey purchased from Ezzigroup.

109. Ezzigroup received that benefit at Dempsey's expense.

110. Under the circumstances, it is unjust for Ezzigroup to retain that benefit without compensating Dempsey.

111. The benefits Ezzigroup received from Dempsey should be returned to Demspey.

## PRAYER FOR RELIEF

WHEREFORE, Dempsey respectfully requests that judgment be entered in full on its claims, and that this Court:

A. Award Dempsey actual and consequential damages for Defendants' unlawful conduct, including pre- and post-judgment interest;

B. Award attorney's fees and costs associated with Dempsey's collection efforts, including the fees and costs associated with litigating this action; and

C. Award Dempsey any other relief that the Court deems just and equitable under the circumstances.

Dated: January 24, 2022                                             Respectfully submitted,

*/s/ Douglas N. Marsh*
Douglas N. Marsh
Lance Hernandez
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Tel.: 720-200-0676
Fax: 720-200-0679
dmarsh@atllp.com
lhernandez@atllp.com

*Attorneys for Dempsey International Packaging*