IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case no.: 1:22-cv-00194

KCOOPER BRANDS, INC. D/B/A
DEMPSEY INTERNATIONAL PACKAGING,

       Plaintiff,

   v.

EZZIGROUP INC., and RAY RASOULI,

       Defendants.

---

## DEFENDANT EZZIGROUP INC.'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND JURY DEMAND

---

Defendant Ezzigroup, Inc. ("Ezzi") submits its Answer, Affirmative Defenses, Counterclaims and Jury Demand. In a separate filing, Defendant Ray Rasouli ("Rasouli") is filing a Motion to Dismiss based on: lack of personal jurisdiction; and failure to state a claim of personal liability due to the lack of allegations that he was acting for his personal benefit, rather than acting within the scope of his representation of Ezzi as its CEO.

## I.    COMPLAINT

### A. INTRODUCTION

**COMPLAINT 1.** *This is an action for fraud and breach of contract arising from fraudulent misrepresentations made by Ezzigroup and its CEO, Rasouli, to procure an agreement with Dempsey to deliver certain purchased products to Dempsey, and Ezzigroup's failure to comply with its contractual obligations and deliver the products as it promised to do.*

**ANSWER 1.** Ezzi admits the Complaint is based on claims of fraud and breach of contract. All other allegations are denied.

**COMPLAINT 2.** *Rasouli, on behalf of Ezzigroup, represented to Dempsey that Ezzigroup owned and operated a factory in China that could supply products for which Dempsey sought a supplier. Rasouli and Ezzigroup represented that Ezzigroup had a unique relationship with the Chinese government that would allow Ezzigroup to procure rebates for the product and to negotiate obstacles in shipping that would ensure delivery of the purchased product at the quoted price and within the allotted time. Dempsey acted in reliance on those representations in entering into a contract with Ezzigroup and submitting purchase orders thereunder.*

**ANSWER 2.** Ezzi admits Rasouli made statements on behalf of Ezzi, and as its CEO, to Dempsey International Packaging ("Dempsey") and George Dempsey. Ezzi also admits that it informed Dempsey that it had access to a factory in China and a business relationship with the Chinese government that should allow procurement of rebates. Ezzi lacks knowledge as to what Dempsey relied on, and therefore denies allegations about reliance. All other allegations are also denied. Ezzi states Dempsey precipitously breached its agreement with Ezzi by ceasing to issue purchase orders within the first 60 days of the agreement and as a result there was no opportunity to apply for rebates. Ezzi also states that it did not and could not give a guarantee that would "ensure delivery" within a specific time. Dempsey knew or should have known that no company, or even a first world country, could guarantee timely intercontinental shipments in spite of the pandemic and the worldwide problems plaguing the shipping industry.

**COMPLAINT 3.** *Ezzigroup's representations were false. It did not own or operate a factory in China; instead, it attempted to fulfill Dempsey's purchase orders by outsourcing them to another entity. Its representations of having special relationships with the Chinese government that would allow it to navigate through the obstacles faced by the shipping industry have also proven false. Ezzigroup's representations that it could procure the purchased product at the promised price point were predicated on*

*funds Ezzigroup expected would be generated by filing fraudulent rebate claims with the Chinese government.*

**ANSWER 3.** Ezzi admits it did not own or operate a factory in China. All other allegations are denied. Ezzi states it provided Dempsey with factory certifications confirming that the factory was qualified to make wipe materials. Ezzi states it told Dempsey that Ezzi could offer Dempsey low pricing because of the expected rebates after ninety days. But Dempsey breached the agreement by not continuing to issue purchase orders, causing Ezzi to lose substantial sums of money on every box sold to Dempsey.

**COMPLAINT 4.** *Though Dempsey has complied with its obligations under the parties' contracts, including making substantial payments in advance on the purchased product, Ezzigroup failed to ship the majority of the product Dempsey purchased, and also failed to pay the costs of shipping as required under the parties' contract. In the process, substantial funds Dempsey provided to Ezzigroup for the express purpose of paying for the purchased goods to be shipped have been misallocated.*

**ANSWER 4.** Denied. Ezzi objects to the word "purchased" throughout the Complaint when Dempsey is using the word to mean "ordered". An ordered product is not purchased unit it has been paid for in full.

**COMPLAINT 5.** *Based on the misrepresentations made by Rasouli on behalf of Ezzigroup and Ezzigroup's failure to comply with its obligations under the parties' agreements Dempsey seeks damages rising from Defendants' wrongful conduct, including but not limited to damages Dempsey has been required to incur to procure replacement products and costs Dempsey has been required to pay to arrange for delivery of products that should have been delivered to the designated destination, and interest, plus attorney's fees and costs as allowed under the parties' contract.*

**ANSWER 5.** Ezzi admits Dempsey is seeking damages. All other allegations are denied.

## B. PARTIES

**COMPLAINT 6.** *Plaintiff KCooper brands, Inc. d/b/a Dempsey International Packaging ("Dempsey") is a Colorado corporation located at 27371 E Lakeview Dr., Aurora, Colorado 80016.*

**ANSWER 6.** Admitted.

**COMPLAINT 7.** *Defendant Ezzigroup Inc. ("Ezzigroup") is a corporation registered in the province of Ontario, Canada with its principal offices in Ontario, Canada.*

**ANSWER 7.** Admitted.

**COMPLAINT 8.** *Defendant Ray Rasouli is a citizen and resident of Canada and the CEO of Ezzigroup.*

**ANSWER 8.** Admitted.

## C. JURISDICTION AND VENUE

**COMPLAINT 9.** *This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.*

**ANSWER 9.** Admitted.

**COMPLAINT 10.** *Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Dempsey's claims occurred in Colorado.*

**ANSWER 10.** Admitted.

**COMPLAINT 11.** *This Court has specific personal jurisdiction over Defendants because this action rises out of their contacts with this forum—specifically, Ezzigroup's contract with Dempsey, a Colorado company located in Colorado, and representations sent to Dempsey in Colorado. In addition, the contract with Dempsey requires the application of Colorado law to adjudicate this dispute.*

**ANSWER 11.** Ezzi admits this Court has jurisdiction over it. This Court, however, does not have jurisdiction over Rasouli for the reasons stated in his Motion to Dismiss.

### D. FACTUAL ALLEGATIONS

**COMPLAINT 12**. *Dempsey is a Colorado business which provides packaging supplies for other businesses. Among other things, Dempsey is engaged in the marketing and sale of products including sanitation wipes.*

**ANSWER 12.** Ezzi admits that Dempsey is a Colorado business, but it lacks knowledge as to the other allegations; therefore, they are denied.

**COMPLAINT 13.** *Ezzigroup represented to Dempsey that it is engaged in the supply and services of certain products, including the sanitation wipes for which Dempsey is engaged in the marketing and sale.*

**ANSWER 13.** Ezzi admits it made statements to Dempsey about the nature of its dry wipe business.

**COMPLAINT 14.** *In or around July 2021, Ezzigroup, through Rasouli, represented to Dempsey that it wished to manufacture the wipes Dempsey was marketing.*

**ANSWER 14.** Ezzi admits that Ezzi, through Rasouli, communicated with Dempsey about wipes. All other allegations are denied. Ezzi states that Dempsey initiated contact with Ezzi through its employee Bill Nigrini.

**COMPLAINT 15.** *Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a factory in China where the wipes would be manufactured.*

**ANSWER 15.** Denied. Ezzi had access to a factory in China. Ezzi did not own it.

**COMPLAINT 16.** *Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a special relationship with the Chinese government that would allow it to secure a rebate for the manufactured product above and beyond the normal export rebate (approximately 13%).*

**ANSWER 16.** Denied and *See* Answer to para. 2.

**COMPLAINT 17.** *Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup's relationshipwith the Chinese government allowed Ezzigroup to procure the government's cooperation in navigating through obstacles that were then plaguing*

5

*the shipping industry, which would ensure that any product Dempsey purchased through Ezzigroup would arrive in a timely manner.*

**ANSWER 17.**  Denied. Ezzi also states that it did not and could not give a guarantee that would "ensure delivery" within a specific time. Dempsey knew or should have known that no company or even a first world country could guarantee timely intercontinental shipments in spite of the pandemic and the worldwide problems plaguing the shipping industry.

**COMPLAINT 18.** *Ezzigroup, through Rasouli, represented to Dempsey that, if it proved to be necessary, Ezzigroup had the ability to move equipment to Canada to manufacture the wipes for Dempsey; that Ezzigroup had a preferred relationship with the Canadian government, including a sa preferred supplier of PPE masks and gloves to the Canadian government; and that he delivered weekly shipments by air from China to Canada.*

**ANSWER 18.** Denied.

**COMPLAINT 19.** *Ezzigroup, through Rasouli, represented to Dempsey that Ezzigroup had a facility in Tennessee where it could manufacture wipes for Dempsey.*

**ANSWER 19.** Denied. Ezzi's agreement with a manufacturing facility in Tennessee had nothing to do with the Dempsey order.

**COMPLAINT 20.** *Ezzigroup and Rasouli knew these representations were material to Dempsey, as Dempsey's ability to receive the purchased products at the purchased price and without unexpected delays provided Dempsey with assurances but for which Dempsey would have looked to other suppliers for the wipes.*

**ANSWER 20.** Denied. Ezzi lacks knowledge about what Dempsey considered material and what Dempsey would have done.

**COMPLAINT 21.** *Timing in particular was essential, because, as Ezzigroup and Rasouli knew, Dempsey would use the purchased product to fulfill its obligations to its customers and other purchasers of the wipes.*

**ANSWER 21.** Denied. Ezzi lacks knowledge about what Dempsey intended to do with the wipes, or what its obligations to its customers were. Dempsey told Ezzi these products were for Walmart, but their direct buyer is Froggy's Fogs.

*COMPLAINT 22. Ezzigroup was specifically aware that Dempsey required delivery of the product beginning on August 15, 2021, and represented to Dempsey that Ezzigroup would begin delivering the purchased product to Dempsey on August 15.*

**ANSWER 22.** Denied**.** With the understanding that Dempsey would continue to issue purchase orders as agreed upon, Ezzi delivered the initial shipment to the Chicago airport before August 15. Due to airport congestion and the pandemic, the product arrived at its destination and was accepted on August 20.

*COMPLAINT 23. Relying on these representations, Dempsey submitted purchase orders to Ezzigroup on or around July 8, 2021, and again on or around July 14, 2021, through which Dempsey collectively purchased approximately 40,000 containers of wipes. The purchase orders designated as the destination for the purchased goods the address of a Dempsey customer in Tennessee.*

**ANSWER 23.** Denied. Ezzi lacks knowledge of what representations are being referred to and whether Dempsey relied on them. Ezzi admits that purchase orders were issued on July 8 and July 14 of 2021, and that the destination was Tennessee. Ezzi states that only the first 200,000 boxes were DDP. The rest was CIF Port.

*COMPLAINT 24. Dempsey also entered into a Product Supply Agreement with Ezzigroup on or around July 23, 2021.*

**ANSWER 24.** Denied as to the word "also". Otherwise admitted.

*COMPLAINT 25. The terms of the Product Supply Agreement called for Ezzigroup to ship the purchased wipes CIF—a term used in international shipping meaning "cost, insurance, and freight," requiring the shipper to assume all costs of shipping to a designated delivery point.*

**ANSWER 25.** Denied. The Agreement speaks for itself. The parties agreed to CIF to port.

**COMPLAINT 26.** *Under the Product Supply Agreement, Dempsey was to purchase wipes from Ezzigroup "in such amounts and at such prices as agreed by the Parties."*

**ANSWER 26.** Denied. The Agreement speaks for itself and does not require or provide for specific pricing.

**COMPLAINT 27.** *Under the Agreement, Ezzigroup agreed to "fill the projected demand, source, and procure product to have available for Dempsey, which shall be determined by a rolling forecast and at Dempsey's direction."*

**ANSWER 27.** Denied. The Agreement speaks for itself. Ezzi states that it entered into an agreement to provide Dempsey with wipes because of Dempsey's assurances of a continuing stream of purchase orders.

**COMPLAINT 28.** *As specified in an attachment to the Agreement, the product was to be delivered at a rate of approximately 10,000 cases per week, 40,000 cases per month, and 480,000 cases per year, with each case to contain ten units of product. Delivery of the product was to begin on August 15, 2021. Contemporaneous communications exchanged before and after execution of the Agreement confirm the contractual expectation of delivery beginning on August 15, 2021.*

**ANSWER 28.** Denied. The Agreement speaks for itself. Ezzi lacks knowledge as to what Dempsey's contractual expectations were. See response to paragraph 23.

**COMPLAINT 29.** *The terms of the Product Supply Agreement state that Dempsey would submit subsequent purchase orders, pursuant to which Ezzigroup was to deliver the products at a location designated by Dempsey, "within the specific lead-time of receipt of a purchase order"- specified as "90 days out."*

**ANSWER 29.** Denied. The Agreement speaks for itself.

**COMPLAINT 30.** *The terms of the Product Supply Agreement acknowledge that Ezzigroup "assumes responsibility for the Products, and all risk of damage, loss, until the Products are delivered at the Delivery Point." This made Ezzigroup responsible for*

8

*paying all costs of shipping, transport, and  delivery of the purchased product to the destination designated by Dempsey.*

**ANSWER 30.** Denied. Calls for a legal conclusion. The Agreement speaks for itself. As agreed upon, Ezzi's responsibilities changed after the first 200,000 boxes.

The purchase orders and Ezzi's invoices state CIF to the port of destination, not delivery to the address.

**COMPLAINT 31.** *The agreement required Dempsey to provide fifty percent of the purchase price for the wipes upon placing the purchase order, an additional thirty percent of the purchase price upon receiving notification that the purchased goods had shipped, and the remaining twenty percent of the purchase price upon receipt of the purchased goods.*

**ANSWER 31.** Denied. The Agreement speaks for itself. A bill of lading is proof of shipping, but Dempsey demanded to have a telex used to release a shipment, which would have been improper because Dempsey still owed 30% and 20% on each container.

**COMPLAINT 32.** *The Product Supply Agreement specifically stated that the price of each product would include "material costs, packaging costs, tooling cost, warehousing costs, freight and logistics costs, all applicable taxes, customs duties, export duties, or similar tariffs or fees that Supplier may be required to pay or collect in connection with the performance of its obligations under, or in furtherance of, this Agreement." This makes clear that the purchase price, including those portions to be paid in advance of receipt, were to provide Ezzigroup with the funds it needed to pay all costs of shipping and freight to the designated destination at the designated time.*

**ANSWER 32.** Denied. Calls for a legal conclusion. The Agreement speaks for itself.

These allegations are correct for only the first twenty-four containers, The remainder was purchased as CIF, which meant delivery to the port of destination.

Because of an imminent increase in duty taxes, George Dempsey proposed increasing the purchase price so Ezzi could pay for the increased duties.

**COMPLAINT 33.** *Other than paying the required percentages purchase price at the various stages of the shipping process, Dempsey's sole responsibility in connection with the purchased product was to receive it at the designated destination point within the specified time.*

**ANSWER 33.** Denied. Calls for a legal conclusion. Dempsey had several responsibilities, including continuation of issuance of purchase orders, delivery point requirements, fulfillment of the covenant of good faith and fair dealing, and working with Ezzi on addressing problems arising from the pandemic and other conditions beyond either party's control.

**COMPLIANT 34.** *The Product Supply Agreement further provided that the agreement could be terminated for a material breach of the agreement by the other party, if that breach was not cured within thirty days of receipt of written notice thereof—though such termination would not affect or terminate rights and obligations that had accrued thereunder prior to such default in delivery or payment.*

**ANSWER 34.** Denied. Calls for a legal conclusion. The Agreement speaks for itself. Ezzi states that Dempsey, without justification, stopped its P.O on September 3, 2021, forty-two days after the Agreement was signed and after two weeks of Dempsey receiving and accepting shipments. When Dempsey sent the notice falsely claiming that Ezzi was in breach of contract, a large number of containers were either on the water or in port.

**COMPLAINT 35.** *The Product Supply Agreement also provides that Ezzigroup would indemnify, defend, and hold harmless Dempsey against all claims, actions, damages, losses, liabilities, and expenses, including reasonable outside attorney's*

*fees, rising out of or caused by any breach of any of the representations, undertakings, or agreements made by Ezzigroup.*

**ANSWER 35.** Denied. Calls for a legal conclusion. The Agreement speaks for itself.

**COMPLAINT 36.** *Pursuant to the Product Supply Agreement, Dempsey submitted a purchase order to Ezzigroup on August 5, 2021 for the purchase of 40,000 cases, in addition to the ones submitted in July 2021. This purchase order likewise designated as the destination for the purchased goods the address of a Dempsey customer in Tennessee.*

**ANSWER 36.** Denied. Calls for a legal conclusion. The Agreement speaks for itself.

Ezzi admits the dates and number of cases are correct, and that the destination was a location in Tennessee.

**COMPLAINT 37.** *In total, by August 15, 2021—when, under the terms of the Agreement, the product  was to begin being delivered—Dempsey had submitted purchase orders for 80,000 cases, or 800,000 boxes, of product.*

**ANSWER 37.** Denied. Calls for a legal conclusion. The Agreement speaks for itself.

Ezzi admits the accuracy of the numbers for cases and boxes. Ezzi states that Dempsey had agreed to issue purchase orders for 40,000 cases per month for twenty four months.

**COMPLAINT 38.** *In accordance with its obligations under the Product Supply Agreement, Dempsey paid fifty percent of the purchase price on the purchased goods in connection with submitting the purchase orders.*

**ANSWER 38.** Denied. Calls for a legal conclusion. The Agreement speaks for itself.

Ezzi admits payment of fifty percent of the purchase price.

**COMPLAINT 39.** *As of September 3, 2021, Ezzigroup's reports to Dempsey showed that Ezzigroup was projected to deliver less than 2,000 cases, or 20,000 units of product, by the end of September 2021, even though the factory had produced over 500,000 units of product. Thus, Ezzigroup's reports were showing that the finished product was not being shipped.*

**ANSWER 39.** Denied. Ezzi provided documents showing the number of boxes delivered to Dempsey's buyer by airplane. The rest was already on the water or at the port.

**COMPLAINT 40.** *On September 3, 2021, Dempsey sent Ezzigroup and Rasouli written notice of Ezzigroup's material breach of the contract. In the notice, Dempsey reminded Ezzigroup that Dempsey had ordered 800,000 units of product, and that the Agreement called for delivery of 400,000 units (i.e., 40,000 cases) per month starting August 15th, 2021, and that the Agreement had been given under the pretense that Ezzigroup had a special arrangement that would allow it to make deliveries to the USA on time regardless of the current escalating freight costs and constraints. Dempsey therefore demanded that the situation be immediately corrected, as it had and continued to put Dempsey in great jeopardy and liability with its customer.*

**ANSWER 40.** Denied. Calls for a legal conclusion. The document speaks for itself. Ezzi admits it received the document of September 3, 2021. Neither the word "material" or "breach" appears in the letter of September 3, 2021. Also, Ezzi was never given the opportunity to cure as provided for in the Agreement. Ezzi states that Dempsey demanded that Ezzi control conditions that were beyond its ability to change or control. In addition, Dempsey knew from the beginning that Ezzi needed time to make substantial investments in machinery and ramp up production in order to deliver 400,000 boxes per month. Dempsey knew Ezzi would not be able to put 49 containers on the water in the first thirty days. The fact that in our first 30 days Ezzi did not put

48 containers on the water was not a surprise to anyone. In fact, in Ezzi's invoice that was issued to Dempsey prior to receiving the deposit, Ezzi made it very clear that the shipment for the second PO would start immediately after the shipment of the first PO was completed, which meant the second PO was supposed to be shipped after Sep 10 when the first 24 containers had already.

**COMPLAINT 41.** *In total, Dempsey has purchased, and paid the fifty-percent deposit on, a quantity of product corresponding to ninety-six shipping containers.*

**ANSWER 41.** Admitted in Part, Denied in Part. Only the first 50% was paid as a **deposit** to start the production, and the product was not "purchased".

**COMPLAINT 42.** *To date, of the ninety-six containers Dempsey purchased, Ezzigroup shipped only forty-five.*

**ANSWER 42.** Denied. After Ezzi had shipped sixty containers, Dempsey did not agree to fulfill its obligation to continue issuing purchase orders and, as a result, no more containers were shipped. Ezzi never received the 30% due.

**COMPLAINT 43.** *Furthermore, as of November 2021, there has been only one container that Ezzigroup paid all charges necessary for delivery to the designated destination in Tennessee.*

**ANSWER 43.** Denied.

**COMPLAINT 44.** *Ezzigroup had shipped a fraction of the purchased goods piecemeal via air shipments to Chicago. This, however, this represented only a small portion of the total goods Dempsey purchased—an amount corresponding to approximately nine containers, out of the ninety-six Dempsey purchased. Even for this small portion, Dempsey was required to pay for those air-shipped goods to be picked up from port, repalletized, and consolidated on pallets before transport to Tennessee.*

**ANSWER 44.** Denied. Shipment by air was not part of the agreement. Ezzi shipped some product by air as an accommodation to Dempsey and its customer.

*COMPLAINT 45. In addition, what few portions of the product were shipped (rather than sent by air) were sent to the port in Los Angeles, with no arrangements made for their delivery to the designated destination in Tennessee. Dempsey has had to arrange and pay for shipment to their ultimate destination—costs which, under the Product Supply Agreement, were to be paid by Ezzigroup.*

**ANSWER 45.** Denied. Calls for a legal conclusion. The document speaks for itself.

Ezzi lacks knowledge. Ezzi paid from $10,000 to $12,000 per truckload to deliver product. When Dempsey breached the agreement by discontinuing issuance of Purchase Orders and failed to complete payment on more than twenty containers that had already been shipped, Ezzi stopped delivering the goods.

*COMPLAINT 46. In connection with each of the forty-five containers for which Ezzigroup gave Dempsey notice that the container had shipped, Dempsey paid the additional thirty percent of the purchase price.*

**ANSWER 46.** Admitted.

*COMPLAINT 47. Ezzigroup also failed to pay for the shipping and freight costs to ship what portion of the purchased goods were shipped.*

**ANSWER 47.** Denied. Unintelligible. When Dempsey breached the agreement by stopping the purchase orders, there was no funding to continue the operation and it was not possible to apply for rebates.

*COMPLAINT 48. As of the date of the filing of this complaint, several containers are being held in storage, with the shippers refusing to release the goods to Dempsey until the outstanding shipping, freight, and other charges are paid. Those charges include demurrage and storage fees that mount day by day as Ezzigroup continually fails to pay them.*

**ANSWER 48.** Denied. Ezzi lacks knowledge. By breaching the agreement, Dempsey caused these problems, not Ezzi.

**COMPLAINT 49.** *Because of Ezzigroup's failure to provide the product Dempsey purchased, Dempsey was required to look to other sources and purchase replacement products at a price well in excess of what it contracted with Ezzigroup in order to preserve its relationships with its customers.*

**ANSWER 49.** Denied. There was no "failure" by Ezzi. Ezzi lacks knowledge as to the other allegations. Upon information and belief, Dempsey, George Dempsey and others conspired from the beginning to induce Ezzi into a long term agreement, with no intention of completing or following the agreement so that they could show customers that they could deliver product while working covertly toward setting up an operation in the United States, which would explain why George Dempsey asked Ezzi to provide him with raw materials.

**COMPLAINT 50.** *The amounts Dempsey expended to procure this replacement product and preserve its relationships exceed $2 million.*

**ANSWER 50.** Denied. Ezzi lacks knowledge.

**COMPLAINT 51.** *Dempsey has taken still other measures to limit the damages it has suffered due to Ezzigroup's breaches. For example, the shippers have notified Dempsey's customers that they intend to abandon the cargo if the outstanding freight charges are not paid, effectively wasting the amounts Dempsey spent to purchase the product. Dempsey has instructed those carriers to continue to hold the cargo pending resolution of the outstanding balances. As long as Ezzigroup fails to pay the charges, however, the risk remains that the carriers will abandon the product and the value of the purchased product will be lost.*

**ANSWER 51.** Denied. Ezzi did not breach. Ezzi lacks knowledge concerning the other allegations.

**COMPLAINT 52.** *Of the containers that shipped, only 11.5 were received by Dempsey.*

**ANSWER 52.** Denied. The total number of container delivered is 20.

*COMPLAINT 53. Dempsey paid the remaining twenty percent of the purchase price on 8.4 of these containers, withholding payment on the remaining 3.1 in light of the substantial paymentsDempsey had already made on containers that never shipped, and containers that shipped but for which Ezzigroup never paid the shipping costs.*

**ANSWER 53.** Denied. Ezzi agreed to ship the products according to the Agreement. Dempsey violated the Agreement by stopping the purchase orders.

*COMPLAINT 54. The total amount Dempsey has paid Ezzigroup for the wipes is over $1.7 million— representing fifty percent of the purchase price for all 96 containers, an additional thirty percent for 45 containers, and the remaining twenty percent for 8.4 containers.*

**ANSWER 54.** Denied. The total paid is approximately $1.27 million.

*COMPLAINT 55. After executing the contract and submitting the purchase orders, Dempsey learned that Ezzigroup did not manufacture or intend to manufacture the wipes at all, as it represented, and did not own or operate the factory where the wipes would be manufactured.*

**ANSWER 55.** Denied. Ezzi lacks knowledge as to what Dempsey learned or knew; and Ezzi did not make the alleged representations.

*COMPLIANT 56. Instead, Ezzigroup outsourced the requirement to supply the wipes to a Chinese organization named Octopus Supply Chain Management Company.*

**ANSWER 56.** Denied. Octopus is name of the "factory" referenced in Ezzi's prior Answers.

*COMPLIANT 57. Octopus likewise did not own or operate the factory; instead, it purchased the wipes from a factory Dempsey understands is wholly owned by the Chinese government.*

**ANSWER 57.** Admitted.

*COMPLIANT 58. Dempsey has learned that Octopus purchased the product from the government- owned factory for $1.60 per case, but filed a tax rebate claim asserting that it had purchased the wipes at a price of $5.50 per case—a clear instance of tax fraud.*

**ANSWER 58.** Denied. Ezzi lacks knowledge about what Dempsey "learned".

**COMPLIANT 59.** *On information and belief, Dempsey asserts that Ezzigroup was aware that Octopus, a close business partner with Ezzigroup, filed or intended to file claims for tax rebates that made fraudulent claims as to the purchase price. This belief is based in part on information including Ezzigroup's representations that it could get substantial rebates beyond the normal export rate.*

**ANSWER 59.** Denied.

**COMPLIANT 60.** *On information and belief, Dempsey asserts that this potential for unlawful gains was part of Ezzigroup's motivation for agreeing to provide the wipes to Dempsey at the offered price. That is, Ezzigroup's knowledge of this source for illicit revenue was a substantial motivation for its willingness to participate in the transaction with Octopus and Dempsey.*

**ANSWER 60.** Denied.

**COMPLIANT 61.** *Ezzigroup's representations that it owned and operated the means of production and that it had special relationships with the Chinese government that would allow it to supply the purchased products within the allotted time were false.*

**ANSWER 61.** Denied. No such representations were made.

**COMPLIANT 62.** *Ezzigroup knew they were false.*

**ANSWER 62.** Denied.

**COMPLIANT 63.** *Ezzigroup made those representations for the purpose of inducing Dempsey to transact with Ezzigroup to allow Octopus to engage in the fraudulent scheme.*

**ANSWER 63.** Denied.

**COMPLIANT 64.** *Documents and other correspondence show that Dempsey has paid Ezzigroup $250,000 more than what Ezzigroup paid for the product it purchased to supply to Dempsey. In other words, the net result of Ezzigroup's interactions with Dempsey is that it has been enriched by a net amount of at least $250,000.*

**ANSWER 64.** Denied. Unintelligible. Ezzi lacks knowledge as to what are the

"documents and other correspondence".

**COMPLIANT 65.** *Under the Product Supply Agreement, Ezzigroup should have allocated that amount toward the cost of shipping the purchased product—most urgently, the goods it has shipped already, and which remain in storage until those costs are paid.*

**ANSWER 65.** Denied.

**COMPLIANT 66.** *Instead, Ezzigroup has retained that $250,000 as profit without either supplying the purchased goods or paying for shipping and transportation as required.*

**ANSWER 66.** Denied.

**COMPLIANT 67.** *Ezzigroup has asserted to Dempsey that it has not paid the outstanding shipping costs, or supplied the outstanding purchased goods, because Dempsey has not continued to issue purchase orders and supply the initial fifty-percent deposit on those goods. Were Dempsey to do so, Ezzigroup asserted, it could use that fifty-percent deposit to pay the outstanding shipping costs on goods already shipped and continue to procure and ship the remaining purchased goods.*

**ANSWER 67.** Denied.  Objection. Rule 408.

**COMPLIANT 68.** *Ezzigroup thus acknowledges that its arrangement with Dempsey is effectively a pyramid scheme: new payments, made in connection with new purchase orders (which thus impose new obligations on Ezzigroup), are purportedly required to satisfy old obligations in connection with old purchase orders.*

**ANSWER 68.**  Denied.

**COMPLIANT 69.** *Ezzigroup has also asserted to Dempsey that Dempsey's failure to continue to issue epurchase orders notwithstanding Ezzigroup's failure to complete the initial ones excuses Ezzigroup's failure to perform, because the commitment to ongoing purchases is necessary to justify initial upfront investments in infrastructure to be able to provide the requested supply of product. This assertion, too, is transparently baseless, given that Ezzigroup has not produced any of the purchase product, and has instead outsourced it to another company that has supplied the product as manufactured by a Chinese Government-owned manufacturing facility.*

**ANSWER 69.** Denied. Objection. Rule 408.

*COMPLAINT 70. Ezzigroup, through Rasouli, asserted that the factory made capacity investments to service the contract with Dempsey. However, the factory did not expand; rather, it outsourced the production to another factory.*

**ANSWER 70**. Denied.

*COMPLAINT 71. In addition to the fact that every excuse Ezzigroup has offered is facially deficient, the fact remains that Dempsey timely complied with all of its obligations under the Product Supply Agreement, including its obligation to purchase the wipes and pay the required deposits upon submitting the purchase order and receiving notification of shipment, prior to issuing written notice to Ezzigroup of its breach.*

**ANSWER 71.** Denied. Dempsey has not paid the 30% second payment for ~~20~~ 15 containers that have been shipped.

*COMPLAINT 72. On the other hand, Ezzigroup failed from the outset to comply with its obligations under the Product Supply Agreement, including to arrange for the product's delivery to the designated destination in Tennessee and pay for all costs of shipping and freight associated therewith.*

**ANSWER 72.** Denied.

*COMPLAINT 73. Ezzigroup, through Rasouli, represented to Dempsey that Octopus had secured shipper financing for the remaining shipments based on a commitment of ongoing business. On information and belief, Dempsey alleges that Octopus secured that purported commitment through false pretenses, by sending falsified documents to the shippers in order to gain financing and get shipments released.*

**ANSWER 73.** Denied.

*COMPLAINT 74. Supporting that belief, Rasouli approached Dempsey on a number of occasions asking Dempsey to give Ezzigroup fake purchase orders from a company affiliated with Dempsey for the purpose of causing the shipper to believe that there was more business coming from Ezzigroup, and thereby inducing the shipper to enter into agreements to ship and/or release the product intended for Dempsey. Though Dempsey refused to comply with this request, Dempsey believes Ezzigroup made similar requests to other companies that complied with those requests.*

**ANSWER 74.** Denied.

**COMPLAINT 75.** *Based on these facts and continued misrepresentations, on information and belief, Dempsey alleges that Ezzigroup never intended to comply with its contractual duties to Dempsey and entered into the Product Supply Agreement with the intention of requiring Dempsey to comply with its obligations to provide the up-front portions of the purchase price without complying with Ezzigroup's obligations to supply the purchased product in the amounts and time required by the Agreement.*

**ANSWER 75**. Denied.

**COMPLAINT 76.** *Ezzigroup's material breaches of its obligations under the Product Supply Agreement excuse Dempsey's obligations, including its obligation to continue sending purchase orders to a supplier that has been unable or unwilling to comply with its obligations notwithstanding that it has received substantial payment that was to be used to satisfy those very obligations.*

**ANSWER 76.** Denied.

**COMPLAINT 77.** *Dempsey formally terminated the Product Supply Agreement on January 6, 2022.*

**ANSWER 77.** Denied. Dempsey could not terminate the agreement after it materially breached it.

## <u>COUNT 1</u>

### **Fraudulent Misrepresentation (All Defendants)**

**78.** *Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.*

**ANSWER 78.** Ezzi realleges and incorporates all prior Answers.

**79.** *Rasouli and Ezzigroup made specific representations of fact, including that Ezzigroup owned and operated manufacturing facilities in China and had a special relationship with the Chinese government that would allow them to navigate obstacles in shipping the products Dempsey would purchase from Ezzigroup and ensure that Ezzigroup could supply the purchased product at the quoted price and within the requested time.*

**ANSWER 79.** Denied.

**80.**     *Rasouli and Ezzigroup knew those representations were false.*

**ANSWER 80.** Denied.

**81.**     *Rasouli and Ezzigroup made those representations with the intention of inducing Dempsey to rely on those representations and purchase the wipes from Ezzigroup instead of looking for other sources to supply the wipes.*

**ANSWER.** Denied.

**82.**     *Dempsey reasonably acted in reliance on those representations and entered into the Product Supply Agreement with Ezzigroup.*

**ANSWER.** Denied.

**83.**     *Dempsey's reliance on Ezzigroup has already caused it to suffer significant damages, including in particular the purchase price it has paid on product that Ezzigroup never shipped, as well as product that Ezzigroup shipped but never arranged or paid for delivery to the designated destination.*

**ANSWER.** Denied.

**84.**     *Dempsey's reliance on Ezzigroup also caused it to suffer damages for the amounts Dempsey had to spend to procure alternative sources of product and preserve customer relationships.*

**ANSWER.** Denied.

**85.**     *Dempsey is entitled to recover these and all other damages Dempsey may suffer as a direct result of the fraudulent misrepresentations made by Rasouli and Ezzigroup.*

**ANSWER.** Denied.

## COUNT 2

### Fraud by Omission (All Defendants)

**86.**     *Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.*

**ANSWER.** Ezzi realleges and incorporates all prior Answers.

**87.**    *Rasouli and Ezzigroup failed to disclose to Dempsey material facts that they had a duty to disclose to Dempsey in order to render not misleading the representations they made concerning Ezzigroup and its operations in China, including those outlined in connection with Count I above.*

**ANSWER.** Denied.

**88.**    *In addition, Rasouli and Ezzigroup failed to disclose material facts including that Octopus was involved in acts of fraud against the Chinese Government, including by submitting requests for tax rebates that claimed Octopus purchased the product at prices several times higher than what it actually paid.*

**ANSWER.** Denied.

**89.**    *Had Dempsey been aware of Octopus's conduct, it would have refused to enter into the Product Supply Agreement, and would have looked to other sources for the purchased product such that Dempsey would not be even indirectly involved in such illegal schemes.*

**ANSWER.** Denied.

**90.**    *Rasouli and Ezzigroup were aware of Octopus's fraudulent conduct but deliberately failed to disclose that information to Dempsey with the intent of securing Dempsey's execution of the Product Supply Agreement.*

**ANSWER.** Denied.

**91.**    *Dempsey executed the Product Supply Agreement under the false impression that Rasouli and Ezzigroup had disclosed all material facts they had a duty to disclose.*

**ANSWER.** Denied.

**92.**    *Dempsey has suffered and is entitled to recover all its damages outlined above.*

**ANSWER.** Denied.

## COUNT 3

### Breach of Contract (Ezzigroup)

**93.**    *Dempsey realleges and incorporates all prior paragraphs of this Complaint*

*as if alleged herein.*

**ANSWER.** Ezzi realleges and incorporates all prior Answers.

*94.    Dempsey and Ezzigroup entered a binding contract that required Ezzigroup to deliver the purchased goods at a designated destination.*

**ANSWER.** Admitted.

*95.    Ezzigroup breached the contract by failing to deliver the purchased goods at the designated destination by the specified due date.*

**ANSWER.** Denied

*96.    Ezzigroup further breached the contract by failing to pay the costs of shipping and freight for the purchased goods.*

**ANSWER.** Denied

*97.    Ezzigroup further breached the contract by failing to manufacture or procure and ship the goods Dempsey purchased.*

**ANSWER.** Denied

*98.    Dempsey complied with all its obligations under the Product Supply Agreement or is excused from performance thereunder due to Ezzigroup's material breaches.*

**ANSWER.** Denied

*99.    Dempsey has satisfied any and all conditions precedent to bring this lawsuit.*

**ANSWER.** Denied

*100.    Dempsey suffered damages as a result of Ezzigroup's breach, including but not limited to the purchase price it paid on goods that were never delivered, amounts Dempsey has had to pay to secure alternative sources of product, shipping and freight costs Dempsey has had to pay, and attorney's fees and costs (to which it is entitled under the contract).*

**ANSWER.** Denied

## COUNT 4

### Promissory Estoppel (Ezzigroup)

*101.   Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.*

**ANSWER.** Ezzi realleges and incorporates all prior Answers.

*102.   Ezzigroup made a promise to Dempsey that it would provide the product that Dempsey ordered.*

**ANSWER.** Admitted.

*103.   Ezzigroup should reasonably have expected that its promise would induce action by Dempsey.*

**ANSWER.** Denied

*104.   Dempsey reasonably relied on the promise to its own detriment, including in particular by paying a substantial portion of the purchase price.*

**ANSWER.** Denied

**105.**   Ezzigroup's promise must be enforced to prevent injustice.

**ANSWER.** Denied

## COUNT 5

### Unjust Enrichment (Ezzigroup)

*106.   Dempsey realleges and incorporates all prior paragraphs of this Complaint as if alleged herein.*

**ANSWER.** Ezzi realleges and incorporates all prior Answers.

*107.   Dempsey asserts this unjust enrichment claim in the alternative to its contract-based claims.*

**ANSWER.** Admitted

*108.   Dempsey conferred a benefit upon Ezzigroup in the form of the payments*

made as a deposit toward the purchase price of the wipes Dempsey purchased from Ezzigroup.

**ANSWER.** Admitted.

***109.*** *Ezzigroup received that benefit at Dempsey's expense.*

**ANSWER.** Denied

***110.*** *Under the circumstances, it is unjust for Ezzigroup to retain that benefit withoutcompensating Dempsey.*

**ANSWER.** Denied.

***111.*** *The benefits Ezzigroup received from Dempsey should be returned to Dempsey.*

**ANSWER.** Denied.


## II.    AFFIRMATIVE DEFENSES

### A. FORCE MAJEURE

After the Agreement was signed by both parties, it was considered effective on July 23, 2021. Prior to the Agreement, the COVID pandemic was becoming a force majeure: however, soon after the Agreement was executed, there was an unprecedented confluence of shipping and delivery conditions beyond the control of both parties, including container shortages, congestion in the Los Angeles ports, labor shortages, trucker shortages, and chassis shortages. In the late summer and early fall of 2021, these factors evolved into a perfect storm that caused shipping and delivery delays Ezzi could not surmount and could only ride out.

Section 19 of the Agreement expressly provides:

Neither Party shall not be considered in default hereunder or be liable for any failure to perform or delay in performing any provisions of this Agreement in the customary manner to the extent that such failure or delay is caused by any reason beyond its control, including any act of God, fire, explosions, pandemics or other state or national health emergencies, hostilities, or war (declared or undeclared), strike or work stoppage . involving either Party's employees, or governmental restrictions; <u>provided, however,</u> that the Party declaring force majeure shall give prompt written notice to the other Party of the commencement, nature, and termination of the force majeure condition. The Party whose performance has been interrupted by such circumstances shall use every reasonable means to resume full performance of this Agreement as promptly as possible.

Dempsey, like the rest of the distributors in the shipping industry, was well aware of the global delays being caused by unprecedented force majeure conditions. Ezzi and Dempsey exchanged numerous written and oral communications about the pandemic related delays; and Ezzi did what it could to shorten the delays, but before it could "resume full performance" of the Agreement, Dempsey breached the Agreement by not continuing to issue purchase orders. As a result, Ezzi "shall not be considered in default hereunder {i.e., under the Agreement) or be liable for any failure to perform or delay in performing any provisions of this Agreement." Agreement, Section 19.

## B. IMPOSSIBILITY OF PERFORMANCE

Restatement (Second) of Contracts § 266. Subsection (2) provides:

"Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary."

Because of the unanticipated perfect storm of conditions described above in the Force Majeure Affirmative Defense, the principal purpose of the Agreement was "substantially frustrated" with no fault on Ezzi's part; therefore, there was no duty to meet the impossible shipping and delivery deadlines mandated by Dempsey.

### C. ESTOPPEL

Dempsey is estopped from asserting claims based on allegations that either Ezzi or Mr. Rasouli made oral or written misrepresentations outside of the Agreement. The Agreement expressly provides that as the Entire Agreement it supersedes all other understandings, and that the parties affirm that they did not rely on any representations not recited in the Agreement:

**18.** ENTIRE AGREEMENT

This Agreement constitutes the final, complete, and exclusive statement of the Agreement of the Parties with respect to the subject matter hereof and supersedes any and all other prior and contemporaneous agreements and understandings, both written and oral, between the Parties.

**24.** AFFIRMATION OF THE PARTIES.

The Parties affirm that they have entered into this Agreement freely, voluntarily, and without reliance on any promises, representations, or other statements not contained in this Agreement and that they have read and understood this Agreement.

### D. ECONOMIC LOSS RULE

Claims based on allegations of fraud or misrepresentation occurring after July 23, 2021, the effective date of the Agreement, are barred by the Economic Loss Rule.

### E. REPUDIATION

Without a just cause or excuse, Dempsey indicated it would not perform, and did not perform, its contractual obligation to provide purchase orders for a two year period.

### F. MISREPRESENTATIONS

Dempsey falsely represented that it would provide purchase orders for two years. The misrepresentation was material; and Ezzi relied on it.

## III.    COUNTERCLAIMS

### 1. PARTIES

1.    KCooper Brands, Inc. d/b/a Dempsey International Packaging("Dempsey") is a Colorado corporation located at 27371 E Lakeview Dr., Aurora, Colorado 80016.

2.    Ezzigroup Inc. ("Ezzi") is a corporation registered in the province of Ontario, Canada with its principal offices in Ontario, Canada.

3.    Ray Rasouli is a citizen and resident of Canada and E z z i ' s  CEO.

### 2. JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

5.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Counterclaims occurred in Colorado.

6.     This Court has specific personal jurisdiction over Ezzi because this action rises out of its contacts with this forum.

7.     This Court does not have personal jurisdiction over Ray Rasouli for the reasons stated in the simultaneously filed Motion to Dismiss.

### 3. FACT ALLEGATIONS

8.     The Product Supply Agreement (Agreement) between Dempsey and Ezzi became effective on July 23, 2021.

9.     The Agreement is attached as Ex. A.

10.    For a term of 2 years, Dempsey planned on purchasing approximately 40,000 cases (400,000 boxes) of product per month for every month of the Term.

11.    Orders were to commence August 15, 2021.

12.    Purchase orders were required to be submitted 90 days in advance of delivery.

13.    Section 7 of the Agreement states that "Supplier shall deliver the Products to a location designated by Dempsey (the "Delivery Point") as defined in the attached Exhibit A, within the specified lead time of receipt of a Purchase Order" (emphasis added).

14.    Exhibit A does not specify a "Delivery Point".

15.    Ezzi was to be responsible for freight and insurance charges to the mutually agreed delivery point, and Dempsey was to be responsible for those charges beyond that point.

16.    Ezzi informed Dempsey that its contract manufacturer had to make up-front investments in equipment and tooling in order to meet the contract volumes over the two year period of the Agreement.

17.    The investments totaled approximately $400,000.

18.    Before the Agreement was executed, Ezzi received an initial purchase order from Dempsey for 200,000 boxes dated July 8, 2021.

19.    Ezzi accepted this early purchase order.

20.    Pursuant to the 90 day delivery term, delivery on the July 8 purchase order was due by October 6, 2021.

21.    The first shipment of product departed from China by sea on July 20, 2021.

22.    The second month's purchase order (for August 2021) for 400,000 boxes was received by Ezzigroup on August 5, 2021, prior to the date specified for the first order.

23.    In August of 2021, a worldwide backlog developed for oversea shipments due to the Covid-19 pandemic and related conditions.

24.    The entire supply chain was affected by labor shortages, port congestions, shortages of truckers and chassis, and lack of logistics capabilities to offload and deliver containers.

25.    The lag time for ships to dock at Los Angeles was more than two weeks.

26.    Ezzigroup and the manufacturer agreed to begin shipping the product by air freight.

27.   This process began in early to mid-August 2021, with product starting to arrive at the customer's location the week of August 16, 2021.

28.   The extra cost for shipping by air freight was approximately $380,000.

29.   The next purchase order was due in mid-September 2021.

30.   Dempsey refused to issue additional purchase orders.

31.   On September 3, 2021, Dempsey sent Ezzi the letter attached as Ex. B.

32.   The first delivery was not due until October 6, 2021.

33.   At the time of Dempsey's September 3 letter, over 205,000 boxes of product had been shipped to the United States.

34.   In a phone conversation between Mr. Rasouli and George Dempsey, Mr. Dempsey stated that Dempsey's September 3 letter was "for show" and was sent only to demonstrate to Dempsey's customer that Dempsey was pressuring the manufacturer to complete delivery as soon as possible.

35.   By approximately October 6, 2021, the actual due date for the initial purchase order, the Ezzi had shipped 408,330 boxes of product, which was, enough to fulfill the two purchase orders for the month of July 2021, which called for 403,200 boxes.

36.   Ezzi had some control on when product was put on a ship in China.

37.   Ezzi had no control on when a ship would reach port in the United States.

38.   Ezzi had no control when the product would be taken off a ship and put on shore.

39.    In late Summer and Fall of 2021, there was unprecedented congestion in the Los Angeles ports.

40.    Ezzi was not responsible for the port congestion.

41.    Ezzi had no control over the port congestion.

42.    In late Summer and Fall of 2021, there was a shortage of containers.

43.    Ezzi was not responsible for the container shortages.

44.    Ezzi had no control over the container shortages.

45.    In late Summer and Fall of 2021, there were chassis shortages.

46.    Ezzi was not responsible for the chassis shortages.

47.    Ezzi had no control over the chassis shortages.

48.    In late Summer and Fall of 2021, there were labor shortages.

49.    Ezzi was not responsible for the labor shortages.

50.    Ezzi had no control over the labor shortages.

51.    In late Summer and Fall of 2021, Dempsey was aware of the port congestion.

52.    In late Summer and Fall of 2021, Dempsey was aware of the container shortages.

53.    In late Summer and Fall of 2021, Dempsey was aware of the chassis shortages.

54.    In late Summer and Fall of 2021, Dempsey was aware of the labor shortages.

55.    Within two weeks of product starting to arrive in Los Angeles, Dempsey refused to issue more purchase orders.

56.    Dempsey issued a total of three purchase orders.

57.    The Agreement was for 400,000 boxes of dry wipes for a two-year period.

58.    Ezzi's profit was $0.30 per box.

59.    Ezzi's monthly gross profit was to be $120,000.

60.    Ezzi's gross profit for the twenty-four month period would have been $2,880,000.

61.    Dempsey paid Ezzi a total of $ 1,272,426, amounting to 1.37 months' worth of revenue.

62.    Ezzi's loss in earnings is approximately $ 2,880,000.

63.    Ezzi is also due $87,000 as a second milestone payment of 30% on fifteen containers.

64.    The second milestone payment was due upon the booking of freight / issuance of a BOL from China.

65.    Ezzi continued to supply Dempsey with product after September 3, 2021, and up to Jan 2022.

## COUNT 1

## BREACH OF CONTRACT

66.    Ezzi realleges and incorporates all prior paragraphs of this Counterclaim.

67.    Dempsey and Ezzi entered into a binding Agreement, which is attached as Ex. A.

68.    Dempsey breached the Agreement as alleged in the Fact Allegations, including by repudiating the Agreement and failing to: issue purchase orders at a rate of 40,000 cases per month over a period of two years; make required payments;

honor the terms and conditions of the Agreement; and continue the issuance of purchase orders.

69. Ezzi complied with all its obligations under the Agreement or   is excused from performance due to Dempsey's material breaches and the Force Majeure conditions described in Ezzi's Affirmative Defenses.

70. Ezzi has satisfied any and all conditions precedent to bring this lawsuit.

71. Ezzi suffered damages as a result of Dempsey's breaches, including but not limited to loss of revenues, the extra costs incurred to meet Dempsey's demands, amounts Ezzi has had to pay to reduce the delays being caused by the Force Majeure conditions, and attorney's fees and costs.

## COUNT 2

## PROMISSORY ESTOPPEL

72. Ezzi realleges and incorporates all prior paragraphs of this Counterclaim.

73. Dempsey made a promise to Ezzi that it would purchase product for a two year period.

74. Dempsey reasonably should have expected that its promise would induce action by Ezzi.

75. Ezzi reasonably relied on the promise to its own detriment.

76. Dempsey's promise must be enforced to prevent injustice.

## COUNT 3

## UNJUST ENRICHMENT

77.    Ezzi realleges and incorporates all prior paragraphs of this Counterclaim.

78.    Ezzi asserts this unjust enrichment claim in the alternative to its contract-based claims.

79.    Ezzi conferred a benefit upon Dempsey in the form of delivery of product.

80.    Dempsey received that benefit at Ezzy's expense.

81.    Under the circumstances, it is unjust for Dempsey to retain that benefit without compensating Ezzi.

82.    The benefits Dempsey received from Ezzi should be returned to Ezzi.

## COUNT 4

83.    Ezzi realleges and incorporates all prior paragraphs of this Counterclaim.

84.    There is a justiciable controversy between the parties concerning performance of obligations under the Agreement.

85.    Ezzi requests that the Court declare that any failure on Ezzi's part to fulfill all of the obligations imposed by the Agreement are excused because of Force Majeure conditions and impossibility of performance.

## IV.    JURY DEMAND

Defendant Ezzigroup, Inc. demands a trial by Jury on all claims so triable.

Dated: February 25, 2022        Respectfully submitted,


*/s/ Richard A. Oertli*
Richard A. Oertli
24800 Squaw Pass Road
Evergreen, Colorado 80431
Phone: 720-799-5217
Email: dickoertli@gmail.com

*Attorney for Ezzigroup, Inc and Ray Rasouli*


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of February 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Douglas N. Marsh:   dmarsh@atllp.com
Lance Hernandez:   lhernandez@atllp.com


*/s/ Christi Rolston*
Christi Rolston, Paralegal